UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ALFRED PATTON #155175,                                    Case No. 2:18-cv-00170

      Plaintiff,                                       Hon.   Janet T. Neff
                                                  U.S. District Judge

  v.

SUSAN M. WILSON, et al.,

      Defendants.
_____/

## REPORT AND RECOMMENDATION

### I.  Introduction

State prisoner Alfred Patton filed this civil rights action pursuant to 42 U.S.C. § 1983 on October 1, 2018.   He alleged that the Defendants involved in his medical treatment violated his constitutional rights under the First, Eighth, and Fourteenth Amendments.   Patton subsequently filed an amended complaint on May 14, 2019 that asserted only that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.

Patton experienced gastrointestinal problems for many years.   These problems were found to be cancer in September 2018.   Patton believes that Defendants should have discovered his cancer much sooner.

Defendants are:   Nurse Practitioner (NP) Susan M. Wilson, Registered Nurse (RN) Gerald Covert, RN Maria Bennet, RN Robyn Waybrant, and RN Mary Guild.

NP Wilson filed a motion for summary judgment.   (ECF No. 35.)   She asserts that Patton failed to exhaust his administrative remedies and that he has failed to

show the existence of any genuine issues of material fact relating to his deliberate indifference claim.

Defendants Covert, Bennet, Waybrant, and Guild also seek summary judgment on grounds that Patton failed to exhaust his administrative remedies and that he has failed to show the existence of any genuine issues of material fact relating to his deliberate indifference claim.   (ECF No. 51.)

This report and recommendation (R&R) does not address NP Wilson's arguments regarding exhaustion of administrative remedies.   Those issues appear more complicated than the arguments briefed.   If there are unresolved remaining issues after this R&R is addressed by the Court, the undersigned will conduct a status conference to determine the need for supplemental briefing, oral argument, or a bench trial to resolve any remaining exhaustion issues.

The Court has reviewed the materials filed by the parties that includes the voluminous medical records.   The undersigned concludes that no genuine issues of material fact exist, and all Defendants are entitled to summary judgment.

Although the alleged delay in diagnosing cancer may potentially state a negligence or medical malpractice claim, the record before the Court establishes that each Defendant treated Patton appropriately when he presented with his medical concerns.   Patton experienced ongoing intermittent abdominal pain that was exacerbated by food.   He sought and received frequent treatment for his abdominal pain and discomfort before a tumor was discovered in his small intestine.   The tumor was surgically removed. Patton continues to receive treatment from medical

2

personnel and oncology care for his continued battle with cancer.   Patton has failed to present verifying medical evidence in the record establishing that an unnecessary delay in his treatment, or discovery of his cancer, violated his Constitutional rights.

Although the Court is not unsympathetic to Patton, the record fails to establish the existence of a genuine issue of material fact that the named Defendants acted with deliberate indifference to his serious medical needs.

## II.   Factual Allegations

Patton says that while he was confined at the Chippewa Correctional Facility his Eighth Amendment right to medical care was denied by the Defendants.   (ECF No. 26.)   Patton alleges that on November 25, 2015, he was experiencing vomiting and pain in his stomach that extended into his back.   (*Id*., PageID.100.)   The pain was worse after he ate.   (*Id*.)   Patton says that he was examined by RN Bennett. She told him that there was nothing wrong and gave him over-the-counter antacid pills. (*Id*., PageID.101.)

On April 4, 2016, Patton expressed progressively worsening symptoms to Prisoner Counselor Thompson.   Thompson told him to send a health care request to see a doctor.   (*Id*.)   On April 22, 2016, Patton says that he visited health care and was provided over-the-counter antacid tablets.

Patton says that he requested medical care on July 19, 2016, due to experiencing excruciating pain.   On July 22, 2016, Patton informed medical staff about his pain symptoms and his concerns about an apparent allergic reaction to the reflux medication.   On September 28, 2016, Patton informed housing staff that his

3

condition had worsened.   He was seen by a nurse who took his vital signs.   On November 29 and December 5, 2016, Patton complained of pain, severe vomiting, and diarrhea.   (*Id*.)   NP Wilson examined Patton and told him to continue taking antacids.   (*Id*.)

Patton claims that each of the Defendants failed to properly diagnose his condition and simply treated him with antacids and pain medication despite knowing that his condition could not be alleviated by Tylenol or Aspirin.   (*Id*., PageID.103-106.)   Patton claims that Defendants were deliberately indifferent to his serious medical needs and requests compensatory and punitive damages.

### III.   Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

## IV. Analysis of Patton's Eighth Amendment Deliberate Indifference Claim

### A. Legal Standards

Patton argues that NP Wilson, and RNs Covert, Bennet, Waybrant, and Guild were each deliberately indifferent to his serious medical needs by failing to make a timely cancer diagnosis.   The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.   U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency.   *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.   *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component.   *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).   To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.   *Id.*   In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.   *Id.*   "[A]n inmate who complains that ***delay in medical treatment*** rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed."   *Napier v. Madison*

*Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (emphasis added, citations omitted).   The

Court of Appeals elaborated on the holding in *Napier* in its 2004 ruling in *Blackmore*

*v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004), where the Court stated the following:

> *Napier* does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's ***failure to treat a condition adequately***, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury.

*Blackmore*, 390 F.3d at 898 (emphasis added).   Thus, *Napier* and *Blackmore* provide

a framework for assessing a claim of delayed or inadequate care for a non-obvious

condition:   A plaintiff making this type of claim must place verifying medical

evidence in the record to show the detrimental effect of the delayed or inadequate

treatment.

However, the objective component of the adequate medical care test is satisfied

"[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a

lay person."

The subjective component requires an inmate to show that prison officials have

"a sufficiently culpable state of mind in denying medical care."   *Brown v. Bargery*,

207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834).   Deliberate

indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835,

but can be "satisfied by something less than acts or omissions for the very purpose of

causing harm or with knowledge that harm will result."   *Id.*   Under *Farmer*, "the

official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Id.* at

837.   The subjective component was recently summarized in *Rhinehart v. Scutt*, 894

F.3d 721 (6th Cir. 2018).   The court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference.   Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness."   This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.
>
> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.
>
> But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it."   A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful.   A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailor, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals."   That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "*consciously* expos[ed] the patient to an *excessive* risk of *serious* harm."

*Id.* at 738–39 (6th Cir. 2018) (internal citations omitted).

- 7 -

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment.   *Estelle*, 429 U.S. at 105.   As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind.   Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.   Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.   In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted).

Differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim.   *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering.   *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."   *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).   If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort

law." *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell* 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).   He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

### B. Defendants' Treatment of Patton

The records indicate that Patton was examined on November 25, 2015, by a nurse after he complained of having abdominal pain.   (ECF No. 35-2, PageID.155-158.) Patton reported that he had stomach cramping, vomited, and could not completely empty his bowels.   (*Id.*)   He was assessed with nausea due to gastrointestinal issues.   (*Id.*, PageID.157.)   A physician's assistant recommended a clear liquid diet and a day off from his work detail.   (*Id.*, PageID.158.)   Patton refused to comply with the recommendation.   (*Id.*)

The next day, RN Bennet scheduled Patton to see health services after he reported he was feeling better but wanted an examination.   (*Id.*, PageID.160.)   NP

- 9 -

Wilson instructed Patton to drink eight to twelve cups of water per day and to call health care if his condition worsened.   (*Id.*, PageID.159.)

By December 1, 2015, Patton reported that he was feeling better, but that he was constipated.   (*Id.*, PageID.161.)   NP Wilson informed him to drink ten glasses of water per day, rest, increase his fruit, vegetable, and high fiber cereal consumption, and to exercise in moderation.   (*Id.*, PageID.163.)

Patton had his blood drawn for laboratory testing because he has hepatitis C. (*Id.*, PageID.164-165.)   A nurse reported on March 2, 2016, that Patton had "no complaints" and that he denied "recurrent abdominal pain."   (*Id.*, PageID.168.)

On March 24, 2016, NP Wilson conducted a chronic care visit with Patton due to his hepatitis status.   (*Id*, PageID.172.)   Patton complained of abdominal pain, but did not have decreased appetite, nausea, or vomiting.   (*Id.*) NP Wilson gave Patton a stool card, ordered lab tests, and he declined a rectal exam.   (*Id.*, PageID.173, 175.)   The stool card returned negative results.   (*Id.*, PageID.177.)

Patton indicated on April 22, 2015, that he believed his stomach pain was caused by the food he was eating.   (*Id.*, PageID.180.)   A nurse checked Patton and instructed him to keep a food journal.   (*Id.*, PageID.182.)

Patton reported abdominal discomfort on May 5, 2016, and a nurse noted that his GI complaints increased over the past few months.   (*Id.*, PageID.184.)

On May 10, 2016, Patton was given the medications Simethicone and Alamag. (*Id.*, PageID.186.)   Patton reported that he has recurrent abdominal pain "in the upper stomach and upper right side of stomach that radiated to his back" depending

on his food consumption.   (*Id.*, PageID.187.)   Nurse Practitioner Buchanan assessed Patton with GERD and provided him with Zantac for his acid reflux symptoms.   (*Id.*)

NP Wilson examined Patton on September 22, 2016, during a hepatitis chronic care visit.   (*Id.*, PageID.191-194.)   She discontinued the Zantac medication and noted that Patton had a normal abdominal examination and no complaints of nausea or vomiting.   (*Id.*)   Wilson ordered a urinalysis and urine culture.   (*Id.*, PageID.195-196.)   RN Covert collected Patton's urine on that same date (*Id.*, PageID.199) and documented the laboratory orders on November 2, 2016.   (*Id.*, PageID.198.)

NP Wilson saw Patton on September 22, 2016, for gastrointestinal problems due to diarrhea and constipation. (*Id.*, PageID.200-203.)   NP Wilson noted hypoactive bowel sounds and dull percussion in the lower left quadrant.   (*Id.*)   She prescribed Senna for constipation, advised Patton to increase his water intake, provided magnesium citrate, Dulcolax tablets, and ordered a follow-up visit.   (*Id.*)   During the follow-up visit, Patton reported that the medicine worked and he felt better.   (*Id.*, PageID.205.)

On October 10, 2016, Patton was examined by Dr. Bienvenido Canlas, M.D. (*Id.*, PageID.211-215.)   Dr. Canlas ordered an abdominal x-ray and lab studies. (*Id.*)   The x-ray results revealed a normal abdomen.   (*Id.*, PageID.219.)   RN Bennet collected Patton's lab specimen. (*Id.*, PageID.221.)   Patton was seen by a nurse on December 2, 2016, and was referred to a dietician.   (*Id.*, PageID.223.)

On February 21, 2017, RN Bennett instructed Patton to fast and only drink water before his blood draw the next day. (*Id.*, PageID.229.)   The next day, RN Covert drew Patton's blood sample for laboratory testing.   (*Id.*, PageID.230.)

NP Wilson examined Patton during his March 23, 2017, chronic care visit. (*Id.*, PageID.237-239.)   NP Wilson noted that Patton experienced abdominal pain sometimes associated with cramping and nausea.   (*Id.*)   On examination his abdomen presented with dull percussion in the lower left quadrant.   NP Wilson offered Protonix for acid reflux and Tylenol.   (*Id.*)   Patton declined the medication and a rectal examination.   (*Id.*)   NP Wilson gave him a stool card and ordered Senna. (*Id.*)   The lab specimen was collected by RN Covert on April 3, 2017.   (*Id.*, PageID.247.)   NP Wilson entered a chart update noting that the stool labs were negative.   (*Id.*, PageID.248.)

NP Wilson examined Patton during his September 8, 2017, chronic care visit. (*Id.*, PageID.250-252.)   Patton reported that he occasionally experienced diarrhea, constipation, and abdominal pain.   (*Id.*)   The exam revealed a normal abdomen. (*Id.*)   On October 11, 2017, H. Pylori Antigen Stool testing was ordered. (*Id.*, PageID.261-265.)   RN Covert collected the sample for testing.   (*Id.*, PageID.266.) On October 24, 2017, NP Wilson informed Patton that the results were negative. (*Id.*, PageID.271, 273.)   NP Wilson examined Patton on November 16, 2017, to check on his hepatitis and to schedule a follow-up visit.   (*Id.*, PageID.275-276.)

Patton complained about abdominal pain going to his back and kidney on December 2, 2017.   (*Id.*, PageID.277-279.)   Patton was given Kaopectate and

Zantac and told to contact health care if he did not get better. (*Id*.)  RN Guild examined Patton on December 7, 2017, for pain radiating into Patton's back.  (*Id*., PageID.281-282.)  RN Guild notified NP Wilson, assessed Patton with abdominal pain, and ordered Phenergan for nausea.  (*Id*.)  NP Wilson entered a chart update on December 7, 2017.  (*Id*., PageID.283-284.)

On December 15, 2017, NP Wilson saw Patton.  She noted he still had stomach issues and ordered testing that included pancreatic enzymes.  (*Id*., PageID.285-287.)  On December 26, 2017, RN Guild instructed Patton to fast the night before his blood draw.  (*Id*., PageID.288.)

NP Wilson examined Patton on January 24, 2018.  Patton stated that he had intermittent stomach issues over the past ten years, every other week or every other month, that he believed were caused by his food.  (*Id*., PageID.292.)  Patton had a normal examination and NP Wilson ordered simethicone chewable tablets to take as needed.  (*Id*., PageID.293.)  NP Wilson examined Patton on March 8, 2018.  (Id., PageID.296-300.)  Patton reported that had gas and diarrhea issues, but his examination was otherwise normal.  (*Id*.) Patton declined a rectal examination. (*Id*.)  NP Wilson provided stool cards.  (*Id*.)

RN Covert conducted an "Annual Nurse Well Encounter" with Patton on March 16, 2018.  (*Id*., PageID.304.)  Patton denied recurrent abdominal pain and bloody or black stools. (*Id*.)  RN Bennet evaluated Patton for complaints of worsening abdominal pain on March 26, 2018.  (*Id*., PageID.308-311.)  She noted that he has hepatitis C, directed that in "6 months to check for cancer," and ordered Zofran.  (*Id*.)

She further indicated that Patton had an ultrasound in the morning.   Patton refused to see health care staff for a re-check on March 27, 2018.   (*Id.*, PageID.317.)

On April 3, 2018, NP Wilson made a chart update after reviewing the liver ultrasound.   (*Id.*, PageID.320-321.)   She noted that there was a "1.3 cm mildly hyperechoic nodular structure within the central right hepatic lobe. Developing mass not excluded."   (*Id.*, PageID.320, 322.)   NP Wilson requested a CT scan.   (*Id.*)

Patton phoned health care services, on that date, requesting to speak to NP Wilson because he wanted something for pain.   (*Id.*, PageID.329.)   RN Guild spoke with Patton and told him he would need to be evaluated.   Patton became argumentative so RN Guild hung up the phone.   (*Id.*)   on the same date, RN Waybrant noted Patton came to the health services waiting room in no apparent distress while staff was responding to an emergent call.   (*Id.*, PageID.330.)   Patton was instructed to wait, but he said he was going back to his unit to lay down.   (*Id.*)

NP Wilson examined Patton on April 11, 2018.   (*Id.*, PageID.332.)   She discussed the results of the ultrasound and that a CT scan was approved.   (*Id.*)   At that time, Patton indicated that the pain was in his intestinal area and not in the stomach area.   (*Id.*, PageID.334.)   Patton's abdomen was x-rayed on April 13, 2018, and the impression was normal.   (*Id.*, PageID.339.)   NP Wilson ordered laboratory tests on April 19, 2018.   (*Id.*, PageID.342-344.)

On May 3, 2018, NP Wilson documented the results of the CT scan:

**SITE: URF W**
**COMPLETED BY:  Susan H. Wilson, NP        05/03/2018 4:01 PM**

1.8cm soft tissue structure with cnetral coarse calcification a few small bowel loops adhere.  Similar structure noted previously.  THIS LESION could represent a small CARCINOID TUMOR less likely a calcified lymph node.  FU with Nuclear octreoscan of abd would benifit  4/30/18

(*Id.*, PageID.351.)   NP Wilson made a request to Utilization Management, her superiors, for a nuclear octreoscan of the abdomen, but that request was denied. Utilization Management denied the request because the "structure has noted not to change in three years, and radiology notes surveillance to be an option in management. As IM has cirrhosis and will be receiving regular follow ups, recommend surveillance."   (*Id.*, PageID.357.)

NP Wilson saw Patton on August 9, 2018, for complaints of vomiting and ordered a clear fluid diet and Promethazine HCl as needed for gastric discomfort and nausea.   (*Id.*, PageID.366-370.)   RN Covert saw Patton the next day for diarrhea and spoke with the physician and NP Wilson.   (*Id.*, PageID.371-372.)   RN Covert told Patton to continue with the liquid diet and to take Phenergan as prescribed. (*Id.*)

On August 18, 2018, RN Bennet saw Patton for abdominal pain. RN Bennet contacted a medical provider who gave orders to send Patton to the War Memorial Hospital emergency room.   (*Id.*, PageID375-378.)   The emergency department noted:

Patient was evaluated upon arrival. Vital signs found to be stable. IV was inserted and patient was given 1L of normal saline. Labs and urinalysis unremarkable. Patient reported pain improved after giving fluids. With negative vital signs, benign abdominal exam, unremarkable labs, and improvement with fluids imaging was not warranted today. I believe patient likely has a viral gastroenteritis. I encourage patient to stay well hydrated with water and to return should symptoms worsen. He was discharged in a stable condition.

(*Id.*, PageID.382.)   RN Bennet assessed Patton upon his return from the hospital. (Id., PageID.385-387.)   She ordered magnesium citrate, educated Patton on the importance of a fiber diet instead of starches, to increase fluid intake, and to stay active.   (*Id.*)

Patton's health care concerns were extensively treated during August and September of 2018 by numerous medical professionals, including several individuals who are not named Defendants in this lawsuit.   On August 22, 2018, RN Covert completed a Nurse Protocol regarding the status of Patton's current medical orders. (*Id.*, PageID.399.)   Patton visited with health care staff several times the next day. (*Id.*, PageID.400-407.)   NP Wilson saw Patton on that day.   She noted that Patton had a history of intermittent gastrointestinal and abdominal pain over the last ten years.   (*Id.*)   Patton has no family history of colon cancer.   (*Id.*)   Patton indicated that he would turn in the last stool card that he had received and that he had not turned in the stool cards for several years.   (*Id.*)   NP Wilson ordered Patton Lactaid for his diet and referred him to a dietician.   (*Id.*)   NP Wilson ordered magnesium citrate for constipation on August 28, 2019.   (*Id.*, PageID.416.)

On September 6, 2018, RN Covert entered a clinical progress note to indicate that Patton decided to stop his clear liquid diet (*Id.*, PageID.430.) and RN Guild

conducted a health assessment of Patton for gastrointestinal issues. (*Id.*, PageID.437-438.)   RN Guild wrote:

**Subjective:**
I just want the pain to stop. This been going on for over a month.

**Objective:**
CO called from housing unit, says inmate vomited x1 and c/o abdominal pain (this was during evening med line) he came up & waited until medline finished. I saw him at the half door & reviewed his chart. He is having discomfort, has not used the HWB given to him 9/4 he said he didn't know what good it would do, he didn't follow the 72 hour clear liquid diet he said it wouldn't matter, has not taken the Phenergan because "it doesn't work". He was seen earlier today by nursing as follow up to his 9/4 appointment. He has had a 9# weight loss since this started. He does not want to be evaluated tonight if I can't do anything to make the pain go away. I requested that he continue to use the HWB until he can be seen by an MP, I requested he continue to have clear liquids, he refused. I encouraged him to take the phenergan, he refused.
He does appear to be very uncomfortable and acknowledges he is the same as he was this morning. He admitted to eating fish sticks at dinner, which he threw up.

**Assessment:**
Knowledge deficit r/t ongoing health issue

**Plan:**
UNR as he has been seen by nursing multiple times w/ no improvement.

(*Id.*, PageID.439.)

On September 7, 2018, NP Wilson saw Patton for a chronic care visit and to address gastrointestinal, cirrhosis, weight loss, and constipation concerns. (*Id.*, PageID.442-444.)   Patton refused her suggestion to take Senna, Lactulose, or Dulcolax. (*Id.*) NP Wilson ordered suppositories and cream to address hemorrhoid symptoms. (*Id.*)   She ordered an abdominal x-ray and laboratory tests and requested a follow-up ultrasound based upon the "structure in mesentery identified on CT liver profile 4/30/18."   (*Id.*, PageID.444-445.)

The x-ray revealed a potential bowel obstruction causing NP Wilson to send Patton to the War Memorial Hospital emergency department for further evaluation. (*Id.*, PageID.456-458.)   During his hospital stay, it was discovered that Patton had a tumor that had spread to his lymph nodes.   (*Id.*, PageID.478-480.)   On September

11, 2018, Patton underwent surgery to remove the tumor.   (*Id.*)   The diagnosis is shown below.

**FINAL DIAGNOSIS**

A.   SMALL BOWEL (ILEUM) WITH TUMOR, RESECTION:
 - WELL DIFFERENTIATED NEUROENDOCRINE TUMOR (CARCINOID TUMOR), GRADE G1.
 - PRIMARY SITE OF NEUROENDOCRINE TUMOR MEASURES 1.5 CM IN GREATEST DIMENSION.
 - TUMOR INVADES SUBSEROSA AND FOCALLY APPROACHES THE VISCERAL PERITONEUM.
 - LYMPHOVASCULAR INVASION AND PERINEURAL INVASION IDENTIFIED.
 - FIVE OUT OF TWENTY-FIVE LYMPH NODES (5/25) POSITIVE FOR METASTASES.
 - BOTH MARGINS OF THE RESECTION NEGATIVE FOR TUMOR.
 - PLEASE SEE MICROSCOPIC DESCRIPTION FOR SYNOPTIC REPORT AND AJCC STAGING.

(*Id.*, PageID.488.)

After surgery, Patton returned to URF and continued to receive daily treatment from Defendants and other medical staff until he transferred to the Gus Harrison Correctional Facility in Adrian, Michigan on October 4, 2018.   Patton continues to receive treatment with the Michigan Department of Corrections and further treatment through staff at the University of Michigan and Henry Ford Allegiance Medical Oncology.

### C. Analysis

It is unfortunate that Patton's cancer was not discovered sooner. Undoubtedly, Patton experienced a great deal of discomfort at different times from 2015 to September 2018, when he underwent surgery.   Patton's cancer diagnosis is very serious.   But the records outlined above show that, before surgery in September 2018, Patton's actual condition was non-obvious.   Thus, based on the holdings in *Napier* and *Blackmore*, Patton was required to present verifying medical evidence showing that any alleged delayed or inadequate treatment caused him unnecessary

or preventable harm.   He has not done so.   Thus, the undersigned concludes that no genuine issue of material fact exists as to the objective component of Patton's deliberate indifference claim.

In addition, the record before the Court does not create a genuine issue of material fact on the subjective component of Patton's deliberate indifference claim. As explained above in the quote from *Rhinehart v. Scutt*, 894 F.3d 721, Patton is required to present some evidence showing that the Defendant *consciously exposed him to an excessive risk of serious harm*.   But the Defendants would not be liable under the Eighth Amendment if they provided reasonable treatment, even if the outcome of the treatment was insufficient or even harmful.   *Id.* at 738–39.   Here, each Defendant took reasonable steps to address Patton's complaints, and the record shows that Patton received extensive medical treatment for his gastrointestinal and abdominal pain complaints by numerous medical professionals, including several registered nurses, a physician's assistant, nurse practitioners, and doctors.

Patton says that Defendants merely treated him with antacids and over-the-counter medications each time he presented with complaints of abdominal pain. This is incorrect.   The record shows that the Defendants and other medical staff provided Patton with more treatment than simply over-the-counter medications. The medical record establishes that Defendants continually addressed Patton's complaints of abdominal pain by reviewing his diet, conducting laboratory and diagnostic testing, examining him, and prescribing him with medications to alleviate his various symptoms.

- 19 -

Furthermore, Patton underwent extensive laboratory testing and imaging studies. After a May 3, 2018, CT image revealed evidence of a tumor, NP Wilson requested intervention, but her superiors denied that request and indicated that monitoring the growth of the tumor was the best option at that time. (*Id.*, PageID.357.) Prison medical staff, including Defendants continued to provide Patton with regular health care. Ultimately, NP Wilson decided to send Patton to the hospital in September of 2018, after an x-ray revealed a potential bowel obstruction. Hospital doctors then discovered and surgically removed Patton's cancer.

Patton was ultimately diagnosed with cancer, and so he asserts that prior treatment that failed to lead to that diagnosis earlier was constitutionally deficient. But the evidence before the Court fails to establish a genuine issue of material fact regarding Defendants Wilson, Covert, Bennet, Waybrant, and Guild's treatment of Patton.

## V.   Qualified Immunity

As an alternative argument, the four registered nurses, Defendants Covert, Bennet, Waybrant, and Guild, move for qualified immunity from liability. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir.2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Determining whether the government officials in this case are entitled to qualified immunity generally requires two inquiries: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred?   Second, was the right clearly established at the time of the violation?" *Id.* at 538-39 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir.2006).

"A right is 'clearly established' for qualified immunity purposes if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001)). The inquiry whether the right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156; *see also Plumhoff v. Rickard*, 572 U.S. 765, 779, 134 S. Ct. 2012, 2023 (2014) (directing courts "not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced") (internal quotation marks and citations omitted). Thus, the doctrine of qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Humphrey*, 482 F.3d at 847 (internal quotation marks omitted).

"The relevant inquiry is whether existing precedent placed the conclusion" that the defendant violated the plaintiff's rights "in these circumstances 'beyond debate.'" *Mullenix v. Luna*, 36 S.Ct. 305, 309 (2015), citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).   In the undersigned's opinion, the registered nurses are entitled to the

defense of qualified immunity from liability.    Defendants Covert, Bennet, Waybrant, and Guild each provided Patton with limited medical care at URF.    These Defendants were not Patton's primary care providers and conducted first line medical care, including collecting blood or urine samples as ordered by Patton's medical providers.    Defendants Covert, Bennet, Waybrant, and Guild did not diagnose Patton's medical condition.    RN Covert, Bennet, Waybrant, and Guild's responsibilities included providing routine medical care under the supervision and orders of the doctors and nurse practitioners.    In the opinion of the undersigned, Patton has failed to establish that Defendants Covert, Bennet, Waybrant, and Guild took actions that violated his Constitutional rights.

## VI.   Recommendation

It is respectfully recommended that the Court grant the motions for summary judgment.    If the Court accepts this recommendation, this case will be dismissed.

NOTICE TO PARTIES:    Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.    28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).    Failure to file timely objections constitutes a waiver of any further right to appeal.    *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).    *See also Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:     February 27, 2020                  /s/ *Maarten Vermaat*
                                              MAARTEN VERMAAT
                                              U.S. MAGISTRATE JUDGE

- 22 -